**Reversed and Remanded and Opinion and Dissenting filed March 12, 2013.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-11-01110-CV

---

**AVI RON, Appellant**

**V.**

**AIRTRAN AIRWAYS, INC., Appellee**

---

**On Appeal from the County Civil Court at Law No. 3
Harris County, Texas
Trial Court Cause No. 983669**

---

### O P I N I O N

In this breach-of-contract case, a passenger with confirmed reservations on an overseas flight sued the airline after it told the passenger that the flight was canceled. The trial court granted the airline's traditional motion for summary judgment, and the passenger appealed. Because the airline failed to conclusively establish its right to judgment as a matter of law on the grounds expressly presented in its summary-judgment motion, we reverse the judgment and remand

the case.

# I. FACTUAL AND PROCEDURAL BACKGROUND

Appellant Avi Ron purchased five airline tickets from AirTran Airways for himself and his family to fly from Nassau International Airport in the Bahamas to Orlando, Florida on January 3, 2010. It is undisputed that Ron and his family arrived at the airport well in advance of the scheduled departure, but after waiting for several hours, Ron and the other passengers were told that the flight was canceled. AirTran and Ron give different versions of the events that transpired at the airport. In accordance with the standard of review, we summarize the evidence in the light most favorable to Ron, as the summary-judgment respondent.

According to Ron's affidavit testimony, passengers were told that they would have to wait three days for flight service, and they should attempt to secure private lodging because local hotels might be unable to accommodate everyone. Ron states that he and several other passengers went to AirTran's office at the airport and spoke with Susan Bain. He describes their conversation as follows:

> [Ms. Bain] informed the passengers that, "Things are a mess . . . . I am trying to train new agents; it is a work in progress . . . . We were unprepared to add this route . . . . We do not have the personnel to properly serve this route. . . . We are still trying to get things on stream. . . . It is embarrassing that we do not have a plane. . . ."[1]
>
> Ms. Bain further explained to us that AIR TRAN was not required to fly passengers and that the AIR TRAN [sic] had no obligation to provide meals or lodging except for oversold flights. . . . Ms. Bain explained that "Air Tran never has to fly a scheduled flight even if it is not a safety or weather issue." She stated that is a "standard contract" with the passengers in the airline industry and part of the "ticket conditions that all passengers agree to when they buy a ticket". I, along with other passengers, asked Ms. Bain to provide the provisions that allow AIR TRAN to refuse to honor flight service.

---

[1] Ellipses in original.

Ms. Bain explained that it was available at the AIR TRAN home office in Florida and that she did not have it available in the Bahamas. . . . The Contract of Carriage was not at the AIRTRAN customer service counter and it was not available for inspection at the airport.

When Bain turned to reenter AirTran's office, Ron "stepped behind her in the office doorway" and a Bahamian agent "jumped up and pushed the door" against Ron and other passengers, closing the door on Ron's finger. Ron then entered the office again, and the Bahamian agent became "very agitated, excited and loud." Ron states that he was not disorderly and did not direct profanity at any AirTran agent; nevertheless, a few minutes after he left AirTran's office, an airport security officer approached Ron and "discussed the situation with [Ron] and other passengers along with [AirTran's] agents." An AirTran agent told Ron that he and his family would receive lodging, transportation, and meals at AirTran's expense and would be accommodated on the next available flight by AirTran or an alternate airline, but the agent also cautioned Ron that the next scheduled flight was three days later, and that no alternative flights were available for booking. Ron declined the offer, leased a private aircraft, and he and his family flew home.

Ron sued AirTran, alleging violations of the Texas Deceptive Trade Practices–Consumer Protection Act and breach of contract, and AirTran moved for summary judgment on three grounds. First, AirTran stated that all of Ron's claims are preempted by the Aircraft Deregulation Act. Second, AirTran asserted that its Contract of Carriage "incorporates the DOT [Department of Transportation] compensation requirements for denied boarding" and "provides that a passenger is not entitled to compensation for involuntary denied boarding where the flight is cancelled. The only compensation allowed is for a refund of the unused flight segment." Third, AirTran stated that under its Contract of Carriage, it had the right to deny transportation to Ron because he was disorderly.

3

After amending his pleadings to eliminate claims other than his contract claim, Ron filed a summary-judgment response. He produced evidence that when he bought the plane tickets, AirTran sent him a confirmatory email in which AirTran stated as follows:

> Condition of Contract: Air Transportation by AirTran Airways is subject to the terms of AirTran Airways' Condition of Contract including Contract of Carriage . . . . The AirTran Airways [C]ontract of Carriage may be inspected at AirTran Airways customer service counter. For more information, direct inquiries to AirTran Airways, Inc. Customer Relations Department . . . .[2]

This statement was followed by a Florida address.

Ron argued that under Title 14, section 253.4 of the Code of Federal Regulations, an "air carrier shall make the full text of each term that it incorporates by reference in a contract of carriage available for public inspection at each of its airport and city ticket offices." 14 C.F.R. § 253.4(b). If the carrier fails to do so, then the "carrier may not claim the benefit as against the passenger of, and the passenger shall not be bound by, any contract term incorporated by reference . . . ." *Id.* § 253.4(a). Ron argued that because AirTran failed to provide the contract of carriage for public inspection at the Nassau airport, it cannot avail itself of any provisions that were incorporated by reference into the contract of carriage.[3]

---

[2] AirTran produced a copy of the same email as part of its summary-judgment evidence.

[3] Less than two days before the summary-judgment hearing, AirTran filed a reply in which it attempted to raise additional grounds for summary judgment. In response to this document, Ron filed a "counter-response" on the day before the summary-judgment hearing, to which AirTran filed a "surreply" on the same day. The record does not indicate that the trial court considered the summary-judgment grounds that were first raised in AirTran's reply or surreply, and we do not consider them on appeal. *See Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 912 (Tex. 1997) ("A motion for summary judgment must itself expressly present the grounds upon which it is made, and must stand or fall on these grounds alone."); *Reliance Ins. Co. v. Hibdon*, 333 S.W.3d 364, 378 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) ("A movant is not entitled to use its reply to amend its motion for summary judgment or to raise new and independent summary-judgment grounds." (citing *Garcia v. Garza*, 311 S.W.3d 28, 36

The trial court granted Air Tran's motion for summary judgment without stating the grounds. In a single issue, Ron asks us to reverse the judgment because AirTran Airways failed to comply with the requirement to make its Contract of Carriage available at Nassau International Airport.

## II. STANDARD OF REVIEW

We review the trial court's grant of a summary judgment de novo. *Ferguson v. Bldg. Materials Corp. of Am.*, 295 S.W.3d 642, 644 (Tex. 2009) (per curiam) (citing *Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex.*, 253 S.W.2d 184, 192 (Tex. 2007)). We consider all the evidence in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if a reasonable factfinder could, and disregarding contrary evidence unless a reasonable factfinder could not. *See Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006). We must affirm the summary judgment if any of the movant's theories presented to the trial court and preserved for appellate review are meritorious. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003).

The movant for traditional summary judgment has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). A defendant who moves for traditional summary judgment must conclusively negate at least one essential element of each of the plaintiff's causes of action or conclusively establish each element of an affirmative defense. *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010). Evidence is conclusive only if reasonable people could not differ in their conclusions. *City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex.

(Tex. App.—San Antonio 2010, pet. denied))).

5

2005). Once the defendant establishes its right to summary judgment as a matter of law, the burden shifts to the plaintiff to present evidence raising a genuine issue of material fact. *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995).

On appeal, the summary-judgment movant still bears the burden of showing that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Rhone–Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 223 (Tex. 1999). In considering grounds for reversal, we are limited to those grounds expressly set forth in the summary-judgment motions, answers, or other responses, and may not rely on the appellate briefs or summary-judgment evidence. *D.M. Diamond Corp. v. Dunbar Armored, Inc.*, 124 S.W.3d 655, 659–60 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (op. on reh'g) (citing TEX. R. CIV. P. 166a(c) and *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 341 (Tex. 1993)).

### III. ANALYSIS

Ron's defenses to each of the grounds on which AirTran moved for summary judgment rely in large part on the meaning of federal statutes and regulations. We review issues of statutory construction de novo. *Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 768 (Tex. 2011).

Because two of the three grounds on which AirTran sought summary judgment are based on terms of the Contract of Carriage and Ron raised the same defense to each, we begin our analysis with these grounds.

**A.    AirTran failed to establish its right to summary judgment based on language that was incorporated by reference into the contract of carriage.**

In its motion for summary judgment, AirTran asserted that its "Contract of Carriage incorporates the DOT [Department of Transportation] compensation

6

requirements for denied boarding." Despite this statement, AirTran failed to identify any specific federal regulation that is incorporated into its Contract of Carriage and that sets forth compensation requirements applicable here. Although AirTran used the term "denied boarding," which is found in Title 14, part 250 of the Code of Federal Regulations, *see* 14 C.F.R. §§ 250.2 et seq., the regulations codified in part 250 apply to "scheduled flight segments using an aircraft that has a designed passenger capacity of 30 or more passenger seats, operating in (1) interstate air transportation or (2) foreign air transportation with respect to nonstop flight segments originating at a point within the United States." *Id.* § 250.2. In its summary-judgment motion, AirTran did not assert that these requirements were satisfied here. To the contrary, both AirTran and Ron produced evidence that Ron had confirmed reservations for a nonstop flight originating from a point *outside* the United States. Thus, it does not appear that AirTran was referring to these regulations.

AirTran also sought summary judgment based on contract terms that it did not characterize as an incorporation of federal regulations. AirTran asserted that "[t]he Contract of Carriage . . . provides that a passenger is not entitled to compensation for involuntary denied boarding where the flight is cancelled. The only compensation allowed is for a refund of the unused flight segment. Avi Ron's credit card was credited with this amount." AirTran additionally argued that "Pursuant to AirTran Airways Contract of Carriage, they had the right to deny transportation to Avi Ron as his conduct was disorderly, abusive or violent." But the confirmatory email that AirTran sent to Ron does not contain any of these contract terms. It does provide, however, that "Air Transportation by AirTran Airways is subject to the terms of AirTran Airways' Condition of Contract including Contract of Carriage . . . . The AirTran Airways [C]ontract of Carriage

7

may be inspected at AirTran Airways customer service counter."

In his summary-judgment response, Ron pointed out that under federal law, an air carrier must "make the full text of each term that it incorporates by reference in a contract of carriage available for public inspection at each of its airport and city ticket offices."[4]  14 C.F.R. § 253.4(b).  Moreover, "an air carrier may not claim the benefit as against the passenger of, and the passenger shall not be bound by, any contract term incorporated by reference if notice of the term has not been provided to that passenger in accordance with this part." *Id.* § 253.4(a).[5]

According to Ron's summary-judgment evidence, he asked to see the terms of the contract of carriage at AirTran's office at the Nassau airport, and was told that the contract was not available for inspection there.  We must accept this evidence as true and draw all reasonable inferences from it in Ron's favor; thus, for the purpose of summary judgment, we must give effect to section 253.4 by disregarding those contractual terms on which AirTran relies that were incorporated by reference in AirTran's contract of carriage. *See Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153, 102 S. Ct. 3014, 3022, 73 L. Ed. 2d 664 (1982) ("Federal regulations have no less pre-emptive effect than federal statutes.").

In sum, none of the contract terms on which AirTran relies appear in the confirmatory email; at best, they were incorporated by reference, and Ron

---

[4] Although a similar issue was raised in an appeal to this court in a different case, briefing waiver previously prevented us from reaching the merits of the argument. *See, e.g.*, *A.P. Keller, Inc. v. Cont'l Airlines, Inc.*, No. 14-10-00917-CV, 2011 WL 5056241, at *5 (Tex. App.—Houston [14th Dist.] Oct. 25, 2011, no pet.) (mem. op.).

[5] The rule applies to "contracts of carriage for scheduled service in interstate and overseas passenger air transportation." *Id.* § 253.1.  Unlike the regulations of title 14, part 250 discussed above and cited in some of the cases on which AirTran relies, *see, e.g.*, *Delta Air Lines, Inc. v. Black*, 116 S.W.3d 745 (Tex. 2003) (op. on reh'g), the regulations of part 253 are not limited in their application to flights originating in the United States.

8

produced summary-judgment evidence that AirTran failed to make the contract available for inspection at the Nassau airport. We therefore conclude that AirTran failed to establish that it is entitled to summary judgment on the grounds that its contract incorporated terms that disclaimed or limited liability for compensation or permitted it to deny service to Ron.

Because some courts have expressed concern that "[a]irlines might hesitate to refuse passage in cases of potential danger for fear of state[-]law contract actions claiming refusal to transport,"[6] we hasten to point out that under federal law, an air carrier is permitted to "refuse to transport a passenger or property the carrier decides is, or might be, inimical to safety." 49 U.S.C. § 44902(b) (2012). *See also Smith v. Conair, Inc.*, 134 F.3d 254, 258 (4th Cir. 1998) (holding that the contract claims of a passenger who was denied service for failing to produce identification were preempted because the carrier relied on its right, under federal law, to deny service and on its duty to follow a security directive from the Federal Aviation Administration). AirTran, however, did not move for summary judgment on the ground that its failure to transport Ron in accordance with the terms of the confirmatory email was an exercise of its rights or duties under federal law. Instead, AirTran sought summary judgment on the ground that it was contractually permitted to refuse to transport Ron. No such contractual provision is mentioned in the confirmatory email to Ron, and we must accept as true Ron's evidence that the contract of carriage was not available for inspection at the Nassau airport. Because AirTran was required by a federal regulation to comply with Ron's request to inspect the contract at the Nassau airport, the same regulation bars AirTran from "claim[ing] the benefit as against the passenger" of any contract terms incorporated by reference. *See* 14 C.F.R. 253.4(a), (b). Thus, the judgment

---

[6] *See Smith v. Conair, Inc.*, 134 F.3d 254, 259 (4th Cir. 1998).

cannot be affirmed based on any contractual provision relied upon by AirTran in its summary-judgment motion.

**B.      AirTran failed to establish that Ron's claims are preempted.**

AirTran additionally moved for summary judgment on the ground that Ron's breach-of-contract claim is preempted by the Airline Deregulation Act of 1978 ("the ADA"), which provides that "a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation."  49 U.S.C. § 41713 (2012).  Among other things, the ADA is intended to place "maximum reliance on competitive market forces" and to promote "the availability of a variety of adequate, economic, efficient, and low-priced services without unreasonable discrimination or unfair or deceptive practices."  *Id.* § 40101(a)(6), (4).  Although many courts have struggled with the determination of whether a particular breach-of-contract claim is preempted, we are bound by the precedent established by the United States Supreme Court and the Supreme Court of Texas in reviewing such claims of preemption.  We therefore begin by reviewing the primary cases from the federal and state high courts addressing preemption of contract claims under the ADA.

### 1.      *American Airlines, Inc. v. Wolens*

In *American Airlines, Inc. v. Wolens*, the United States Supreme Court described the test to be used in determining whether a state breach-of-contract claim is preempted by the ADA.  513 U.S. 219, 115 S. Ct. 817, 130 L. Ed. 2d 715 (1995).  The case began in the Illinois state courts as separate class-action proceedings in which the plaintiffs asserted that an airline breached its contracts with them by imposing retroactive changes to the airline's frequent-flyer program.

10

*Id.*, 513 U.S. at 224–25, 115 S. Ct. at 822.[7]  The Illinois Supreme Court held that the contract claims were not preempted because the airline's frequent-flyer programs were "peripheral" rather than "essential" to an airline's regulation.  *Id.*, 513 U.S. at 226, 115 S. Ct. at 822.  Although the United States Supreme Court agreed that the breach-of-contract claims were not preempted, the Court rejected the argument that the test for preemption requires a court to determine whether the claim involves matters "essential" to airline operations.  *Id.*, 513 U.S. at 226, 115 S. Ct. at 823 (explaining that the Court's precedent "does not countenance" the state court's approach of separating "matters 'essential' from matters unessential to airline operations." (citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 112 S. Ct. 2031, 119 L. Ed. 2d 157 (1992))).

The test for preemption, the Court explained, begins with a determination of whether the airline's challenged conduct—there, the retroactive devaluing of credits in a frequent-flyer program—"relates" to the airline's "rates, routes, or services."  *Id.*  The Court held that the plaintiffs' claims related not only to "rates" but also to "services," which include "access to flights and class-of-service upgrades."  *Id.*

This was not, however, the end of the preemption test.  The Court further clarified that even if the matter at issue "relates" to the airline's "rates, routes, or services," the claim is not is preempted unless its recognition would amount to the State's enactment or enforcement of a law, rule, regulation, standard, or other provision having the force and effect of law.  *Id.*, 513 U.S. at 228–29, 115 S. Ct. at 824.  As the Court explained,

---

[7] The plaintiffs also alleged that the airline's conduct violated the Illinois Consumer Fraud and Deceptive Business Practices Act, and the Court held that those claims were preempted.  *Id.*, 513 U.S. at 225–26, 115 S. Ct. at 822–23.  Here, however, Ron withdrew his allegations that AirTran had violated similar state consumer-protection statutes.

11

The conclusion that the ADA permits state-law-based court adjudication of routine breach-of-contract claims also makes sense of Congress' retention of the FAA's saving clause, § 1106, 49 U.S.C.App. § 1506 (preserving "the remedies now existing at common law or by statute").[8] The ADA's preemption clause, § 1305(a)(1), read together with the FAA's saving clause, stops States from imposing their own substantive standards with respect to rates, routes, or services, but not from affording relief to a party who claims and proves that an airline dishonored a term the airline itself stipulated. This distinction between what the State dictates and what the airline itself undertakes confines courts, in breach-of-contract actions, to the parties' bargain, with no enlargement or enhancement based on state laws or policies external to the agreement.

*Id.*, 513 U.S. at 232–33, 115 S. Ct. at 826. *See also Delta Air Lines, Inc. v. Black*, 116 S.W.3d 745, 753–54 (2003) (op. on reh'g) ("When parties privately negotiate a contract's terms and then sue in state court for breach of those terms, there is generally no specter of state-imposed regulation.") (citing *Wolens*, 513 U.S. at 228–29, 115 S. Ct. at 824); *Cont'l Airlines, Inc. v. Kiefer*, 920 S.W.2d 274, 282 (Tex. 1996) ("*Wolens'* emphasis on the voluntariness of contractual undertakings is important, not because states have no role in enforcing contracts—they do—but because contract law does not effectuate purposes that could have a prohibited regulatory effect on airlines."). Because the plaintiffs did not seek to enlarge or enhance the parties' bargain based on the state's laws or policies, but instead sought only monetary damages for breach of contract, the Court held that the contract claims were not preempted. *Wolens*, 513 U.S. at 225, 232–33, 115 S. Ct. at 822, 826.

### 2. *Delta Air Lines, Inc. v. Black*

In *Delta Air Lines, Inc. v. Black*, the Supreme Court of Texas applied the

---

[8] The FAA is the Federal Aviation Act of 1958. *See id.*, 513 U.S. at 222, 115 S. Ct. at 821.

preemption test set forth in *Wolens* to a breach-of-contract claim. The suit arose after Robert Black purchased two roundtrip tickets on a Delta flight to Las Vegas, and although his invoice showed that Black had reserved first-class seats for both passengers for the entire trip, Delta had assigned Black's wife a first-class seat only for the return flight. *Black*, 116 S.W.3d at 747. Delta offered the Blacks several options, including seating Black's wife in the coach section of the aircraft during the scheduled flight or seating the couple in the first-class section of a flight later that day. *Id.* The Blacks instead chartered a private jet to and from Las Vegas and paid the aircrew's expenses in Las Vegas for the length of their stay. *Id.* at 748.

Delta moved for summary judgment on the grounds, *inter alia*, that Black's contract claims were preempted. *Id.* at 752. The trial court agreed, but the Tenth Court of Appeals reversed, holding that "federal airline regulations allow passengers whose airline reservations are not honored due to overbooking to seek recovery for damages 'in a court of law or in some other manner.'" *Black v. Delta Airlines, Inc.*, 160 S.W.3d 68, 76–77 (Tex. App.—Waco 2002, pet. granted) (quoting 14 C.F.R. § 250.9 (1984)), *rev'd in part*, 116 S.W.3d 745 (Tex. 2003).

The Supreme Court of Texas reversed. In analyzing the first part of the preemption test, the court quickly determined that Black's contract claim for denial of first-class seating was "related" to the airline's services, a matter not expressly addressed in the intermediate court's decision. *See Black*, 116 S.W.3d at 753 (citing *Wolens*, 513 U.S. at 226, 115 S. Ct. at 823, in which the term "services" was used to include "access to flights and class-of-service upgrades"). The court's preemption analysis thereafter focused primarily on the question of whether Black's claim was based on the terms of the parties' contract or would instead constitute the enactment or enhancement of a state law or policy.

The court emphasized that the contract between Black and the airline incorporated federal regulations governing compensation to passengers with confirmed reservations who nevertheless are denied boarding because the flight is overbooked and an insufficient number of volunteers have agreed to relinquish their seats. *Id.* at 754. Federal regulations—and thus, Black's contract incorporating those regulations—established the circumstances under which passengers who are denied boarding are entitled to compensation, and the way in which such compensation is calculated. *Id.*[9] The regulations (and the contract incorporating the regulations) further provide that a passenger who is eligible for such compensation has the option to decline payment from the airline and seek recovery in a court of law. *Id.* at 755 (citing 14 C.F.R. § 250.9). But a passenger who is offered seating in a different section of the aircraft is not considered to have been denied boarding, and thus, is not entitled to compensation from the airline. *Id.* Such a passenger therefore cannot "decline" compensation from the airline and seek recovery in court. *Id.* Because the airline offered to seat Black's wife in a different section of the aircraft at no extra charge and offered the couple seating on alternative flights arriving in Las Vegas the same day, the Blacks were not "denied boarding" as that term was used in the regulations and incorporated in the contract. *See id.* Black accordingly did not have the option of "declining" compensation and asserting a contract claim in court, because "[t]he passenger option of declining payment from the airline and instead seeking recovery in a court of law is reserved for those passengers who are involuntarily denied boarding and thus eligible for

_____

[9] If the passenger is given a different seat in the aircraft at no extra charge or if the airline arranges alternate transportation that delays the passenger in arriving at his destination or first stopover by no more than an hour, the passenger is entitled to no compensation. 14 C.F.R. § 250.9. An arrival delay of more than one but less than two hours entitles the passenger to 200% of the one-way fare (but no more than $650), and an arrival delay of more than two hours entitles the passenger to receive 400% of the one-way fare (but no more than $1300). *Id.*

denied boarding compensation." *Id.*

The court accordingly concluded that Black's breach-of-contract claim was preempted. The court explained that "[t]he regulations promulgated under the ADA, which are incorporated as part of the contract, provide the procedure and remedy in the event a passenger is denied boarding but offered specified accommodations, and therefore preclude the additional remedies Black has pursued in state court." *Id.* (citing 14 C.F.R. §§ 250.1–.9). Although the ADA permits "suits based on the terms of the parties' bargain 'with no enlargement or enhancement based on state laws or policies external to the agreement,'" *id.* at 750 (quoting *Wolens*, 513 U.S. at 233, 115 S. Ct. at 826), Black was attempting "to modify the contract terms to allow him and his wife to forego the regulatory remedies and instead sue in court." *Id.*

### 3.   *AirTran's Preemption Argument*

Although AirTran cited both *Wolens* and *Black* in its summary-judgment motion, the motion contains little argument concerning preemption of Ron's breach-of-contract claim. AirTran asserted that all of Ron's claims are preempted by federal law, and paraphrased the provision that "a State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation . . . ." 49 U.S.C. § 41713. After discussing some of the facts of *Black*, AirTran made one of the contractual arguments we have discussed. This was followed by a single sentence in which AirTran addressed the possible application of *Black* to this case: "Ron's suit is seeking to do that which the court said in *Black* that a passenger could not due [sic], modify the terms of the contract of carriage by resorting to external laws and remedies of the State."

This case, however, is readily distinguishable from *Black*. In *Black*,

15

procedures and remedies applicable to the Black's claims were set forth in federal regulations and incorporated by reference into the airline's contract with the passenger. In contrast, AirTran's summary-judgment motion contains no identification of any specific federal regulation that is incorporated by reference in the contract and that prescribes a procedure or remedy applicable to Ron's contract claim.[10] Moreover, there was no suggestion that the airline in *Black* was prohibited by federal regulations from relying on any contractual provisions. Here, however, AirTran informed Ron in its confirmatory email that unspecified terms were incorporated by reference into its contract, but when Ron asked to see them at the Nassau airport, he was told they were not available. Thus, unlike the airline in *Black*, AirTran is prevented by a federal regulation from relying on an incorporated contract term for which it failed to supply the required notice. *See* 14 C.F.R. § 253.4. The result is that, unlike the airline in *Black*, AirTran has identified neither a federal regulation nor a contractual provision on which it can rely to limit Ron's available remedies for breach of contract.

A breach-of-contract claim that relates to an airline's services is not preempted simply because the remedy of a common-law claim for monetary damages is not specifically described in the contract or in a federal regulation. This can be seen in *Wolens* itself, in which the Court held that the claims of the plaintiffs—who did not ask the Court to force the airline to adhere to the terms of the parties' bargain, but instead sought monetary damages for the contract's breach—were not preempted. *See Wolens*, 513 U.S. at 225, 115 S. Ct. at 822 ("Plaintiffs currently seek only monetary relief."). In doing so, the Court quoted

---

[10] As previously mentioned, the federal regulations incorporated into the contract in *Black* concerned compensation to passengers who were for denied boarding from an overbooked flight, and those regulations apply to flights originating at a point in the United States. *See* 14 C.F.R. § 250.2. Ron's flight was not alleged to have been overbooked, and it did not originate in the United States.

with approval its plurality opinion in *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 526, 112 S. Ct. 2608, 2612, 120 L. Ed. 2d 407 (1992): "'[A] common-law remedy for a contractual commitment voluntarily undertaken should not be regarded as a "requirement . . . *imposed under State law . . . .*"'" *Wolens*, 513 U.S. at 229, 115 S. Ct. at 824 (alteration in original). The Court further stated that the course it adopted "bears the approval of the statute's experienced administrator, the DOT," *id.*, 513 U.S. at 234, 115 S. Ct. at 827, and pointed out that "the DOT's regulations contemplate that . . . 'ticket contracts' ordinarily would be enforceable under 'the contract law of the States.'" *Id.* at 230, 115 S. Ct. at 825 (quoting 47 Fed. Reg. 52129 (1982)). The source quoted by the Court is the announcement in the Federal Register of the adoption by the DOT's predecessor, the Civil Aeronautics Board, of the federal regulations concerning the obligation of carriers to provide passengers with the text of terms that are incorporated by reference in the contract of carriage—the very regulations on which Ron relies. As the following excerpts illustrate, the same source also clarified that when an airline fails to comply with federal regulations requiring the text of the contract's incorporated terms to be "immediately available to the public wherever its tickets are sold"[11] such that the airline is barred from relying on the incorporated terms, then a state-law claim for breach of contract is not preempted:[12]

> [One commenter has] suggested that the preemption be more specific so as not to preempt State contract remedies and "plain-language" statutes. The Board agrees with this suggestion with respect to

---

[11] Notice of Terms of Contract of Carriage, 47 Fed. Reg. 52128-02, 52132 (Nov. 19, 1982) (codified at 14 C.F.R. pt. 253).

[12] *See Bragdon v. Abbott*, 524 U.S. 624, 642, 118 S. Ct. 2196, 2207, 141 L. Ed. 2d 540 (1998) ("[T]he well-reasoned views of the agencies implementing a statute 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'" (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 139–140, 65 S. Ct. 161, 164, 89 L. Ed. 124 (1944))).

17

contract remedies, and has clarified the fundamental provision in § 253.4 by stating that the enforcement aspects of the rule are in addition to other remedies at law.[13]

. . .

[T]he Board has modified the provisions of the rule to make clear that the "penalty" of an airline not being able to enforce a term only applies with respect to a passenger who has not received the required notice.[14]

. . .

Without the enforcement mechanism of voiding the contract term, the penalty for violating the rule would be limited to a civil penalty action against the airline. The passenger, however, could still be disadvantaged in such a case if the term were still considered valid. Civil penalties will in most cases be far less effective, and far more costly to administer, than simply voiding the term and allowing the passenger to pursue available remedies.[15]

. . .

[T]he Board is requiring a two-step notice to consumers: Each ticket must have a notice, which can and presumably will be standardized, that the contract may incorporate terms in several enumerated areas . . . and each carrier must ensure that concise and correct information concerning these terms is immediately available to the public wherever its tickets are sold.[16]

. . .

[One commenter has] questioned whether there would be any penalty outside of contract law for carriers refusing to comply with the rule. The Board has civil penalty authority under section 901 of the Act, can issue cease and desist orders, and can seek injunctive relief from a U.S. District Court if needed. However, we would expect that *the primary enforcement mechanism would be contract law at the local*

---

[13] Notice of Terms of Contract of Carriage, 47 Fed. Reg. 52128-02, 52130 (Nov. 19, 1982) (codified at 14 C.F.R. pt. 253).

[14] Id.

[15] *Id.* at 52131–32.

[16] *Id.* at 52132.

*level.*[17]

In sum, we conclude that AirTran failed to establish in its motion for summary judgment that Ron's breach-of-contract claim was preempted. Although AirTran makes a number of arguments on appeal that were not raised in its summary-judgment motion,[18] a summary judgment must stand or fall on the grounds expressly presented in the motion. *McConnell*, 858 S.W.2d at 341. We therefore do not consider the merits of these arguments. We also cannot make the airline's summary-judgment arguments for it.

Ours is not the first court to arrive at a result such as this. *See Price v. Delta Airlines, Inc.*, 5 F. Supp. 2d 226, 232 (D. Vt. 1998) ("[W]hether or not notice was provided to the Prices is a material fact in dispute, precluding summary judgment . . . . If notice complying with 14 C.F.R. § 253.4 was not provided, the Prices will not be bound by the claim restriction term."). Thus, for example, we cannot affirm summary judgment based on 14 C.F.R. § 253.5—a provision that is cited by the dissent, but on which AirTran has never relied, and compliance with which AirTran neither alleged nor proved. [19] In a related argument, the dissent

---

[17] *Id.* at 52133 (emphasis added).

[18] Among other things, AirTran argues that (1) Ron failed to prove the existence "of a contract imposing upon AirTran the obligations he claims, or granting him the remedy he invokes"; (2) Ron failed to prove that AirTran breached its contract; (3) Ron elected to receive a refund of his ticket price; (4) Ron created his own loss by rejecting AirTran's proffered alternative arrangements; and (5) Ron's expenses for chartering a flight are neither direct nor consequential damages. Nothing prevents AirTran from raising these issues in any subsequent motion for summary judgment.

[19] This section provides in relevant part as follows:

Except as provided in § 253.8, each air carrier shall include on or with a ticket, or other written instrument given to a passenger, that embodies the contract of carriage and incorporates terms by reference in that contract, a conspicuous notice that:

(a)     Any terms incorporated by reference are part of the contract, passengers may inspect the full text of each term incorporated by reference at the carrier's airport or city ticket offices, and passengers have the right, upon

19

asserts that this court should follow *Casas v. American Airlines, Inc.*, 304 F.3d 517 (5th Cir. 2002) and contends that under that case, an airline may rely on terms incorporated by reference without showing that it complied with section 253.4(a) or 253.4(b), the sections actually at issue in this case. In *Casas*, however, the court specifically pointed out that the incorporated provision at issue was included in notices posted on signs at the airline's ticket counters. *Id.* at 525. Thus, in *Casas*, the airline did comply with section 253.4(b), whereas here, the evidence is that the airline did not comply.

Although the dissent also would affirm on the alternative ground that the summary-judgment evidence fails to address whether AirTran has a ticket office in the Bahamas, this would be inconsistent with the applicable standard of review. It is undisputed that AirTran stated in the confirmation notice that the text of the contract was available for inspection at its "customer service counter," and AirTran produced evidence that this was its "standard contract language"—even though AirTran states in its contract of carriage that the text is available at AirTran's "airport and city ticket offices." Although the confirmatory email fails to provide the notice required by federal regulations, we must draw all reasonable inferences in favor of the summary-judgment respondent, and conclude that, as a practical matter, the customer-service counters referenced in the email are ticket offices.

---

> request at any location where the carrier's tickets are sold within the United States, to receive free of charge by mail or other delivery service the full text of each such incorporated term;
>
> (b)    The incorporated terms may include and passengers may obtain from any location where the carrier's tickets are sold within the United States further information . . .

14 C.F.R. § 253.5(a). The confirmatory email provided to Ron informed him only that the contract "may be inspected at AirTran Airways customer service counter." The statement was not limited to locations where tickets were sold, and contained no mention of the availability of of a copy of the contract by mail or other delivery service.

This is consistent with affidavits provided by AirTran. Susan Bain, for example, attested that she went to the "AirTran manager's office" and directed four agents to take copies of the flight manifest "to the ticket counter" and instructed them that the passengers would be given "customer care kits." Bain stated that "[t]hree agents remained in the office with me and we began filling out the documentation for the care kits," and the fourth obtained the "transportation information that we needed to transport the passengers from the airport to the hotel." AirTran also produced a statement by one of the agents who remained in AirTran's office with Bain. Tracey Lynes identified herself as a "customer service agent" and claimed that she was "on duty at [her] work place (Air Tran Office)" at the time of these events. Together, these statements support the inference that the AirTran office was under the charge of an AirTran employee and was both a "customer service" office and a ticket office.

We therefore sustain the sole issue presented for our review.

## IV. CONCLUSION

Because AirTran did not meet its burden to establish conclusively its entitlement to judgment on the grounds expressly raised in its summary-judgment motion, we reverse and remand the case for further proceedings consistent with this opinion.


/s/    Tracy Christopher
       Justice


Panel consists of Justices Frost, Christopher, and Jamison (Frost, J., dissenting).

21